```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
                       ATHENS DIVISION

ABEOME CORPORATION, INC.,        *

     Plaintiff,
                                 *
vs.                                        CASE NO. 3:22-cv-7 (CDL)
                                 *
J. HAMPTON STEVENS, LISA L.
TORBETT, and GEORGE CAMPBELL,    *

     Defendants.
```

O R D E R

The Court held a hearing in this judicial appraisal action on November 13, 2023 through November 15, 2023. Based upon the evidence presented at that hearing and the applicable law, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. Abeome Corporation, Inc. ("Abeome") sent a notice to its shareholders dated June 15, 2021 that informed the shareholders that the Board of Directors of Abeome recommended two significant transactions—the sale of certain assets to Alloy Therapeutics, Inc. and a joint venture that would result in the combination of Abeome with a company called Bioptha through the formation of a new company, Lanier Biotherapeutics, Inc. Abeome ended up owning 83% of the stock in Lanier.

1

2. Given the nature of these two transactions, counsel for Abeome did not initially contemplate that the Georgia Dissenters' Rights Statute, O.C.G.A. § 14-2-1301 *et seq.*, applied to the transactions. Therefore, the first notice to shareholders did not inform the shareholders of their dissenters' rights under the Georgia statute.

3. Upon being notified by Dissenters' counsel that the statute applied after that initial notice was sent, Abeome sent a second notice to its shareholders that included the appropriate dissenters' rights notice.

4. A majority of Abeome shareholders followed the Board's recommendations and approved the Alloy and Lanier Transactions. The Dissenters in this action voted against the proposals.

5. Dissenters informed Abeome that they dissented from the Board's recommendations and the shareholder action, invoked their right under the Georgia Dissenters' Rights statute to be paid fair value for their shares, and tendered their shares in Abeome, which collectively amounted to 2,325,408 shares broken down as follows:

   J. Hampton Stevens:  1,675,285 shares

   Lisa L. Torbett:  550,000 shares

   George Campbell: 100,123 shares.

At the time of the shareholder vote, there were 123 shareholders who owned a combined total of 38,117,104 outstanding common

shares of Abeome. Dissenters' 2,325,408 shares of common stock represented approximately 6% of Abeome's shares.

6. Abeome offered each dissenter 15 cents per share for each of dissenter's shares. Dissenters rejected that offer and demanded payment of $1.25 per share. Abeome rejected that demand and filed this action in the Superior Court of Athens Clarke County, Georgia pursuant to O.C.G.A. § 14-2-1301 *et seq.* seeking a judicial appraisal of the value of the Abeome shares as of the valuation date of July 27, 2021. Dissenters properly removed this action to this Court based on diversity of citizenship jurisdiction.

7. At the valuation hearing, Abeome presented expert testimony from Kevin Couillard, a valuation expert who the Court found qualified to render opinions on the valuation of Abeome and its shares. Couillard, using a modified version of the well accepted "Black Scholes" "Back Solve" methodology, opined that the shares had a per share value of 21.7 cents. The Court finds that Couillard's application of the Black-Scholes formula to determine the value of common stock here was a novel application of the well-accepted Black-Scholes methodology. The traditional application of Black-Scholes was designed for determining the value of options, not the value of the underlying common stock. The Court found, however, that Couillard's opinions were admissible under Federal Rule of Evidence 702. But in deciding

3

what weight to give to the opinions, the Court did not find Couillard's value opinion dispositive given the novel application of the methodology and the Court's skepticism as to Couillard's heavy reliance on one transaction involving a warrant in his determination of the common stock value on the valuation date. Although the transaction Couillard used in his analysis was the closest in temporal proximity to the valuation date, it did not involve the sale of stock or the exercise of an option to purchase stock. It involved a loan from an Abeome shareholder to the company along with the granting of stock warrants. Couillard determined a value for the loan component of the transaction using a generally reliable methodology, and then took the difference between that amount and the value of the entire transaction and attributed that difference to the value of the warrants, which amounted to approximately 9 cents per warrant. He then plugged that warrant value into a modified Black-Scholes formula to "back solve" for the value of the common stock, which he concluded was 21.7 cents a share. He opined that this was a fair value of the Abeome common stock notwithstanding the undisputed fact that the exercise price of the warrant was $1.25 a share and another transaction had occurred just six months earlier in which the company sold stock for $1.25 per share.

8. While the 21.7 cents per share could be within the range of fair value, the Court is unpersuaded that it is the best estimate of fair value.

9. Dissenters presented expert testimony from Todd Poling who opined that the value of the Abeome common shares at the valuation date was $1.19 per share. The Court found Poling to be qualified and that he used reliable methodologies. To reach his opinion, Poling relied heavily upon: (1) two previous transactions in 2018 and 2020 where Abeome sold stock for $1.25 per share and (2) representations from management and the Board as to that value. The Court finds that Poling's methodology over-weights the previous $1.25 transactions, primarily because the first occurred in 2018 when the financial future of Abeome was more promising and because the second in 2020 demonstrated the willingness of an existing shareholder to inject capital into a financially distressed Abeome without persuasive evidence that the per share sales price was a true indication of the value of the struggling company at that time; instead, the transaction appeared to be part of an effort to revive a vanishing dream with hopes of salvaging prior investments in the company. Poling did not completely discount several negative events that would have a material impact on the future success of the company. Specifically, the company was not meeting its capital-raising objectives and had been turned down

by two significant prospects for funding upon which it had pinned a lot of its hopes. It desperately needed 8 to 10 million dollars in immediate funding to go to the next level toward clinical trials and development. When it lost these two prospects, the Board determined that its options were limited. So it decided to enter into the two transactions which triggered the Dissenters' rights here. These transactions were seen by members of the Board as a last-ditch effort to keep the company's dream alive. They were seen by the Dissenters as a desperate, albeit in their view unnecessary, "hail mary." The Court finds that Poling diminishes the significance of these developments by largely ignoring them in favor of the $1.25 transactions, which occurred before these negative developments were fully understood and appreciated. While the $1.25 transactions should certainly be considered in determining fair value, the Court finds that the fair value at the time of the valuation was substantially less than $1.25 and Poling's $1.19 figure.

10. In summary, the Court is unconvinced that the $1.25 per share price represented the value of the company shares as of the valuation date. This conclusion is based primarily upon the Court's finding that the company's financial condition was deteriorating substantially in 2020 and 2021, and the company was in serious financial distress as of the valuation date.

11. Given that Abeome never produced revenues or an earnings stream and that from the very beginning investors in Abeome were betting more on the science than on the current financial condition of the company, the Court finds that consideration of what Abeome's stock sold for throughout its existence is necessary to try to reach a determination of fair value. It is difficult to pinpoint that the risk on a certain date was more or less than it was on another date because the risk all along was substantial. Thus, just because one transaction may have involved a share price of a quarter does not necessarily mean that the company risk at that time was any greater than it was when a shareholder was willing to contribute additional capital at a higher share price. Below is a chart showing the share price on sales through the years:

| Year | Price |
|---|---|
| 2002/2003 | $0.478 |
| 2005 | $0.505 |
| 2006 | $0.250 |
| 2009/2010 | $0.250 |
| 2011 | $0.250 |
| 2012 | $0.250 |
| 2013 | $0.250 |
| 2014 | $0.740 |
| 2015 | $0.740 |
| 2018 | $1.250 |
| 2020 | $1.250 |

Average Share Price: $0.56[1]

---

[1] The Court understands that this average share price may not have been introduced as a separate distinct figure during the trial, but the Court finds that it is supported by the evidence. The Court further finds that while Dissenters may object to its use in determining fair value, no legitimate objection exists to the arithmetic used to calculate it. The Court finally acknowledges that it is not a "weighted average" based on the

7

The Dissenters' average paid in capital per share through the years was:

        Stevens:   $0.36
        Torbett:   $0.25
        Campbell:  $0.50[2]

CONCLUSIONS OF LAW AND APPLICATION OF LAW TO FACTS

1. This Court has jurisdiction over the parties and the subject matter.
2. Georgia law provides the applicable substantive law in this action, specifically O.C.G.A. § 14-2-1301 *et seq.*
3. The Court finds that Abeome substantially complied with the requirements of §§ 14-2-1302 through 14-2-1327. The Court further finds that Abeome did not act arbitrarily, vexatiously, or in bad faith with respect to the rights provided by Georgia's Dissenters' Rights Statute. Accordingly, Dissenters are not entitled to an award of attorneys' fees, expert fees, or expenses other than those costs described in the following numbered paragraph.
4. The Court further finds that the Dissenters did not act arbitrarily, vexatiously, or in bad faith in demanding

---

numbers of shares bought at the various prices, and someone could quibble with that.

[2] This figure for Campbell is based on the paid in capital by his father-in-law, Heys McMath, from whom he acquired his shares.

payment for their shares. Therefore, costs other than attorneys' fees and expert fees shall be assessed against Abeome.

5. Under Georgia law, "[a] record shareholder of the corporation is entitled to dissent from, and obtain payment of the fair value of his or her shares in the event of" the "[c]onsummation of a sale or exchange of all or substantially all of the property of the corporation if a shareholder vote is required on the sale or exchange." O.C.G.A. § 14-2-1302(a)(3). If the dissenting shareholder's demand for payment remains unsettled, "the corporation shall commence a proceeding within 60 days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest." *Id.* § 14-2-1330(a). Following a nonjury equitable valuation proceeding, "[e]ach dissenter made a party to the proceeding is entitled to judgment for the amount which the court finds to be the fair value of his shares, plus interest to the date of judgment." *Id*. § 14-2-1330(e).

6. All of the foregoing legal prerequisites have been met here. And the Court's remaining job is to determine fair value.

7. The burden of proving fair value generally rests upon Abeome. *Atl. States Constr., Inc. v. Beavers*, 314 S.E.2d 245, 249 (Ga. Ct. App. 1984). But the Court finds that its refusal to

9

adopt Abeome's suggested fair value does not mean that it must accept Dissenters' proposed fair value. It is not a binary choice between Abeome's number and Dissenters' number. Ultimately, the Court has to determine based on the evidence what is fair value. Fair value is the "value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action." O.C.G.A. § 14-2-1301(5). Generally, the shareholder should be "awarded his or her proportional interest in the corporation after valuing the corporation as a whole." *Blitch v. Peoples Bank*, 540 S.E.2d 667, 670 (Ga. Ct. App. 2000). Georgia law does not provide a lot of guidance as to what should be considered in determining fair value. The Court may consider earnings, investment value, and asset value, including earnings history, nature of the business, market position, management, reputation and good will, regularity of dividends, the economy, future prospects, and book value. *See Atl. States Constr.*, 314 S.E.2d at 249–51. But the Court is not restricted to a determination of fair *market* value. Nor should the Court speculate as to fair value; and although its analysis is not restricted to market value, the Court should attempt to determine what a willing purchaser in an arm's length transaction would offer for an interest in the

10

subject business absent consideration of either the positive or negative effects of an impending corporate action, such as a merger or acquisition. *Cf. Cox Enters., Inc. v. News-J. Corp.*, 510 F.3d 1350, 1357 (11th Cir. 2007) (interpreting "fair value" under Florida's election-to-purchase statute.)

8. Many of the factors that would typically be considered in an evaluation of a company's value do not exist for a company like Abeome, which is a biotech start-up with no established revenues or income stream.  It has no earnings to evaluate and certainly no dividends have been paid.  It has no position in the general equity market because it is not yet publicly traded.  It has minimal hard assets; its primary assets consist of intellectual property and employees with scientific expertise to turn that property into promising medical uses.  The company's economic value depends on the likelihood that the company's leadership and employees can convert solid science into a product that can be monetized. As with any biotech start-up, this risky venture occurs in stages.  And Abeome arguably had a promising start. Its science seemed to offer the possibility of producing useful discoveries that could help people and for which there would be a demand.  And through the years, investors willing to take the high risk associated with such endeavors invested in the company from time to time in various ways, including the

purchase of the company's stock. But when it got to the point of taking that big step from discovery to clinical trials, the funding for that critical stage could not be obtained. Thus, the company's progress stalled, and it was forced to make the deals that triggered the Dissenters' Rights Statute in order for the company to survive. Even after this diminishment of optimism in the future prospects of the company, some previous investors continued to invest in the company by purchasing stock at the same rate they had bought the stock before. But their doing so does not necessarily reflect the fair value of the company; it simply indicates that they were willing to try to help address the company's desperate financial needs in order to hopefully see their investments provide some future return. In light of these circumstances, the Court must somehow determine the value of a company that has only a possibility of providing any return on investment, that has no reasonably liquid assets, and that has no track record of significant financial success. The Court's task is to try to determine what a reasonable person would be willing to pay in order to have the chance of a big payoff if the company was able to achieve its dream. With no intent to disparage the importance of the scientific developments that the company discovered, the challenge in determining the company's economic value in some ways

12

resembles an attempt to determine how much a reasonable person would likely pay to join a consortium of gamblers who want to pool their funds to buy lottery tickets for the possibility of winning the next big "Power Ball" drawing. The Power Ball gamblers' uncertainties rest upon the mathematical odds. Abeome investors' uncertainties arose from the challenge of finding funding to take the next step and then the uncertainty of whether that next step would produce results that would allow them to proceed to the next risky step.

9. The Court acknowledges that there were positive developments along the way. The science appears solid and the current shareholders have demonstrated a willingness to keep the company afloat until it can find significant funding to take the next big step—clinical trials. But that optimism is dimmed by substantial risks that have grown more worrisome in the two years preceding the valuation date. The company's track record on capital-raising indicates that raising outside capital has become more difficult at a time when that fundraising is essential to the survival of the company. The company has had to shed some assets and dilute its equity in order to simply stay afloat. The company is essentially illiquid with a balance sheet that reveals insolvency. Ironically, evidence as to the quality of management to navigate the difficult shoals ahead came from the most vocal

dissenter, whose testimony and observations through the recent years made it clear that he had absolutely no confidence in that management, which if his assessment is true supports the proposition that the riskiness of the venture increased as the company approached the valuation date. This increased risk which would be managed by allegedly incompetent management, as Dissenters described them, would have a depressing impact on the value of the company.[3] So the question is: what is the fair value of a company under all these uncertain circumstances? What is a reasonable person willing to pay, or more candidly gamble, in order to see whether the lucky ticket can be drawn.

10. It has been suggested that the methodology adopted as part of the Internal Revenue Code for determining the fair market value of stock options for tax purposes may be instructive. The IRS regulations provide that, in determining fair market value of stock granted by option when the stock is not readily tradable on an established securities market, the valuation should be "determined by the reasonable application of a reasonable valuation method." Treas. Reg. § 1.409A-

---

[3] This observation by the Court should not be interpreted to mean that the Court has made a determination that the management or Board of Abeome was (or is) incompetent. The Court simply observes that if Dissenters' assessment of management is accepted as true for purposes of this proceeding, then such a finding would have a negative impact on the valuation of the company as of the valuation date.

1(b)(5)(iv)(B). Quite frankly, this guidance is not much help. The regulations attempt to provide further help by suggesting that the following factors may be considered in determining whether the method or the application of the method are reasonable: (1) "the value of tangible and intangible assets of the corporation;" (2) "the present value of anticipated future cash-flows of the corporation;" (3) the market value of stock or equity interests in similar corporations engaged in substantially similar business the value of which can be readily determined through nondiscretionary objective means; (4) recent arm's length transactions involving the sale or transfer of such stock; and (5) "other relevant factors such as control premiums." *Id.* The IRS regulations further warn that "use of a valuation method is not reasonable if such valuation method does not take into consideration in applying its methodology all available information material to the value of the corporation." *Id.* All of this sounds good on paper. But the bottom line is that most of the 409A factors don't exist here or are difficult (near impossible) to objectively ascertain. The primary assets of Abeome as of the valuation date were its intellectual property which has value attached to its potential for the science to be monetized, but whether that will happen is guesswork. No cash flow existed as of

15

the valuation date, and one could not reasonably determine the present value of future cash flow. While there is certainly evidence of the value of other biotech startups, those values are based on companies that were farther down the development line than Abeome and were not similarly situated as to an ability to raise capital for continued development. The Court cannot make an objective determination of whether the value of those companies has any probative value as to the value of Abeome. The experts in this case for both parties, while paying lip service to these factors, focus primarily on stock transactions in which existing shareholders in Abeome purchased the company stock.

11. The Court finds that the only objective information that the Court can evaluate is what shareholders have paid in the past for the chance of being an owner in one of the few biotech startups that makes it to the finish line. As noted previously, the share price has ranged from 25 cents a share to $1.25 per share during the company's existence. The shareholders were willing to pay these prices for shares as the company's fortunes fluctuated from optimistic hope to disappointment, back to hope, and then to pessimistic doom. The average share price during the company's existence was 56 cents a share. The Court finds this average to be the fairest

value of the company.[4]  The Court acknowledges that this methodology is not perfect and can certainly be criticized. But the evidence upon which the Court must base its decision is scant at best.  It must determine economic value for an entity whose value rests largely upon a hope that somehow the science can be monetized if all the maybes fall just right. Such a task would make Solomon wring his hands in frustration. But the Court is satisfied that while it certainly cannot determine a fair *market* value for Abeome, the fair value of Abeome as of the valuation date for purposes of the present proceeding is $21,345,578.24, which amounts to 56 cents per share.[5]

12. Based on the foregoing, judgment shall be entered as follows in favor of Defendants/Dissenters and against Plaintiff, Abeome Corporaton, Inc.:

J. Hampton Stevens: $938,159.60[6]

Lisa L. Torbett:    $308,000[7]

George Campbell:    $56,068.88[8]

---

[4] While not necessarily relevant, the Court does note that this average share price exceeds the investment Dissenters made in Abeome.
[5] 38,117,104 outstanding shares as of valuation date multiplied by .56.
[6] 1,675,285 shares held on valuation date multiplied by .56.
[7] 550,000 shares held on valuation date multiplied by .56.
[8] 100,123 shares held on valuation date multiplied by .56.

Dissenters shall submit a Bill of Costs within 28 days of today.  Dissenters shall also file a brief with their calculation as to the appropriate amount of pretrial interest that is recoverable based on the Court's determination of fair value.  Abeome shall have 21 days to object to the Bill of Costs and/or the interest amount.  The judgment will subsequently be amended to add interest and costs.

IT IS SO ORDERED, this 11th day of December, 2023.

                                      S/Clay D. Land

                                      CLAY D. LAND
                                      U.S. DISTRICT COURT JUDGE
                                      MIDDLE DISTRICT OF GEORGIA